Conner vs. Welch and another.

---

CONNER vs. WELCH and another.

*February 10 — March 2, 1881.*

EQUITY *will not relieve from effects of plaintiff's gross negligence.*

1. Equity will not relieve a plaintiff against his own act or contracts, on the ground of mistake or ignorance of facts, where such mistake or ignorance was caused by his gross negligence.

2. Plaintiff, holding a mortgage of land, purchased the land of the mort-
gagor, assuming in consideration thereof the payment of three earlier
mortgages, and agreeing to release the debt secured by the note and
mortgage running to himself. One S. held the three earlier mortgages,
and had also docketed a judgment against the mortgagor which was sub-
sequent to all such mortgages, and had assigned it to W. Plaintiff paid
the amount of said three mortgages to S., and at his request S. satis-
fied them of record; but plaintiff did not then know, nor did S. inform
him, of the existence of said judgment. There was no fraud or collusion
on the part of W. Upon these facts, and others recited in the opinion
as to plaintiff's intelligence, knowledge of business, opportunities for
ascertaining the existence of the judgment lien, and acquaintance with
facts which should have put him upon inquiry: *Held*, that equity will
refuse, on the ground of his negligence, to reëstablish in his favor, as
against such judgment, the lien of the four mortgages or any of them.

APPEAL from the Circuit Court for *Dane* County.

The case established by the pleadings and evidence is cor-
rectly stated in the brief of counsel for the plaintiff as follows:

" The action was brought to foreclose four certain mortgages
made by Martin Osborne and wife upon eighty acres of land
in Dane county, three of which mortgages had been satisfied
of record before the commencement of the action.

" The facts are, that on November 11, 1871, Martin Osborne
was seized in fee of the west half of the northwest quarter of
sec. 25, T. 8, R. 9, Dane county. On the 11th of November,
1871, Osborne and wife gave a mortgage on said land (No. 1)
to John W. Allen for $800 and interest. This is still in force
as a first mortgage on the property, and is not one of the four
mortgages for the foreclosure of which the action was brought.
It confers a right of property prior to the rights of all parties
hereto, and further reference to it in the case is unnecessary.

" November 23, 1871, Osborne and wife gave a mortgage on
said land (No. 2) to Patrick Duffy for $200 and interest. This
mortgage bears date prior to the Allen mortgage, but was ex-
ecuted later, and in terms made subject thereto.

" October 1, 1875, Osborne and wife gave another mortgage
on the land (No. 3) to Patrick Duffy for $250 and interest.

"December 2, 1876, Osborne and wife gave another mortgage on the land (No. 4) to Elizabeth Duffy for $135 and interest.

"February 21, 1878, Osborne and wife gave a mortgage on the same land (No. 5) to *Michael C. Conner,* the plaintiff, for $229 and interest, which mortgage has never been satisfied of record.

"March 1, 1878, the defendant *Christian R. Stein* caused judgment to be entered against Martin Osborne in the circuit court for Dane county, upon a judgment note with warrant of attorney, by his attorneys, Welch & Botkin, a law firm of which the defendant *William Welch* was a member.

"March 2, 1878, the defendant *Stein* assigned said judgment to his said attorney, *William Welch.*

"March 4, 1878, the said mortgages Nos. 2, 3 and 4 (for $200, $250, and $135), were assigned to the defendant *Stein.*

"March 5, 1878, the defendant *Stein,* by his attorneys, the said Welch & Botkin, brought suit to foreclose the said mortgages numbers 2 and 3 (for $200 and $250), making parties defendant thereto, Osborne and wife, the mortgagors, and *Conner,* the plaintiff herein, who held the subsequent mortgage, No. 5, above mentioned, but not making a party defendant the said *Welch,* who held by assignment said judgment.

"March 8, 1878, Osborne and wife, by deed of quitclaim, conveyed said premises to the plaintiff, *Conner,* who, at the time, had no actual knowledge of the *Stein* judgment and its assignment to *Welch.*

"April 9, 1878, at the office of Welch & Botkin, in the presence of Botkin, the plaintiff paid to the defendant *Stein* the amount, principal and interest, of the mortgages in suit (Nos. 2 and 3), together with about $115 costs of suit. At the time of payment he was still without knowledge of the *Stein* judgment. Neither *Stein* nor Botkin spoke of it. Botkin, when asked if he had told *Conner* of the existence of the *Stein* judgment, testified, 'I do not think I did.'   'He (*Con-*

*ner*) paid the money, and then said that he wanted the mortgages satisfied, and asked *Mr. Stein* to come right up with him and satisfy the mortgages at the register of deeds' office and get done with it; and he and *Mr. Stein* went out of the office for that purpose. It was at *Conner's* request. Not a word was said by me or *Stein* in regard to satisfying. There was not a syllable or whisper in regard to it.' The two mortgages were then satisfied by *Stein.*

April 29, 1878, the plaintiff paid *Stein* the amount, principal and interest, of the mortgage for $135, No. 4; which, with the accompanying note, were delivered to him. Thereupon, at plaintiff's instance and request, *Stein* went to the register's office, accompanied by plaintiff, and satisfied the mortgage, *Stein* knowing, and the plaintiff not knowing, of the judgment.

"About December, 1878, the plaintiff first learned of the existence of the judgment from the officer having an execution thereon against his property."

The complaint prays that the discharges of the three Duffy mortgages be cancelled, and for the usual judgment of foreclosure and sale in respect to those mortgages and the mortgage for $229 to the plaintiff, dated February 21, 1878.

It is claimed in the complaint that forty acres of the mortgaged land was the homestead of Osborne, and an injunction is prayed against the sale of such forty acres on execution issued upon *Stein's* judgment. As to the agreement between the plaintiff and Osborne, pursuant to which the latter conveyed to the plaintiff the land mortgaged, the plaintiff testified as follows: "I bought the place of Osborne. I was to pay the mortgages. I did not give him any money besides the mortgages. . . . I gave him an account I held against him, more or less. . . . He had no money, and I paid for the making out of these papers. Forget how much that was. That is all I paid for his deed to me, except that I released him from his liability on the note of $229. Think it was

agreed that I should let Osborne have his note and mortgage. Have no further claim on him or his land for that." The witness testified later that he understood he took the property in satisfaction of his claims, but that it was no part of the consideration of the deed; and, further, to the question, "Didn't you regard the giving to you by Osborne of the quitclaim deed as, between you and Osborne, a settlement of your note and mortgage against him for $229?" the plaintiff answered: "I presume so, but that was omitted in putting the amount in the deed." This is the substance of all the evidence on the subject.

The court found, "*first*, that all the facts stated in the complaint are true, except that no part of the mortgaged premises was the homestead of Osborne when *Stein* recovered his judgment, and that *Stein* is not the owner of such judgment; *second*, that the defendant *Welch* purchased said judgment from the defendant *Stein*, and took the assignment thereof absolutely, for full value, and without notice, fraud or collusion, and that he paid therefor by crediting the said *Stein* on the account of the firm of Welch & Botkin, of which the defendant *Welch* was then and still is a member, with the face amount thereof, towards the payment for legal services theretofore rendered by the said Welch & Botkin for the said *Stein*, and that, as between the said *Welch* and the said Botkin, it was agreed that the amount of said judgment should be received by the said *Welch* on his individual account; *third*, that Mr. Botkin, the law partner of the said defendant *Welch*, transacted the business in the foreclosure suits set out in said complaint, and that said *Welch* had no knowledge of the details of said foreclosure, and of the satisfaction of the mortgages as set out in said complaint; *fourth*, that the cancellation of the mortgages as set out in said complaint was founded upon a mistake upon the part of the plaintiff. That mistake was the supposition that the several mortgages of record, including his own, to the amount in all of the full value of the premises, were the only liens prior to his deed from said Osborne."

As conclusions of law, the court held that the mortgage for $229, executed by Osborne to the plaintiff, is a valid subsisting lien on the land; that the discharge of the three Duffy mortgages should be cancelled, and those mortgages adjudged to be valid and subsisting liens; and that the plaintiff is entitled to a judgment of foreclosure in respect to all four mortgages, and to a sale of the land mortgaged, but not to a personal judgment against either defendant.    Judgment was entered pursuant to these conclusions, and the defendants appealed therefrom.

*S. W. Botkin,* for the appellants:

The equitable and legal interests of the plaintiff in the premises merged, and the lien of the mortgages was entirely destroyed. The question of merger is one of the intention of the person holding the estates.    Where his *intention to* unite the estates is clear or can be gathered from his acts or declarations, all courts must be governed thereby, and the merger follows as of the time he acquired both estates.    It is only when he has clearly expressed an intention that there should be no merger, or where, in the absence of any express intention, he has such interests and is so situated that his position calls loudly upon the equity powers of a court to imply an intention that would save his interests and protect him from loss and injury, that a merger will not result.    *Chester v. Willes,* 1 Ambler, 246; 2 Fonbl., 169, note a; *Compton v. Oxenden,* 2 Ves. Jr., 263; *Forbes v. Moffatt,* 18 id., 389; *Gardner v. Astor,* 3 Johns. Ch., 55; *Mills v. Comstock,* 5 id., 214; *Starr v. Ellis,* 6 id., 393; *James v. Morey,* 2 Cow., 246; *Harbeck v. Vanderbilt,* 20 N. Y., 395; *Champney v. Coope,* 32 id., 543; *Bascom v. Smith,* 34 id., 320; *Sheehan v. Hamilton,* 2 Keyes, 305; *Loomer v. Wheelwright,* 3 Sandf. Ch., 135, 160; *Spencer v. Ayrault,* 10 N. Y., 202; *Rankin v. Wilsey,* 17 Iowa, 466; *Hill v. Pixley,* 63 Barb., 203; *Knowles v. Lawton,* 18 Ga., 476; 1 Green's Ch. (N. J.), 239; 37 Wis., 469.    In this case the testimony clearly shows the

intention of the plaintiff that his interests as mortgagee and purchaser should be united. Having once been merged, the lesser estate cannot be revived. *James v. Morey*, 2 Cow., 320. Before a court of equity can interfere to reinstate the mortgages on the ground of mistake, it must be shown: (1) That the mistake is one of fact and not of law. 1 Green (N. J.), 145. (2) That the alleged mistake led the person seeking relief to do the act sought to be relieved from. In this case there was no evidence that the plaintiff would have acted differently, had he known of the existence of the judgment lien. (3) It must be shown that the mistake or ignorance of fact was not the result of any negligence on the part of the person seeking relief. 1 Fonbl. Eq., Bk. 1, ch. 3, sec. 3; 1 Story's Eq. Jur., § 146; *Penny v. Martin*, 4 Johns. Ch., 566; 2 Wis. Leg. News, 135; *Frazee v. Inslee*, 1 Green (N. J. Eq.), 145, 239; *Deare v. Carr*, 2 id., 513; *Banta v. Vreeland*, 15 N. J. Eq., 103; *Rupert v. Mark*, 15 Ill., 540; *Morrison v. Kelly*, 22 id., 624; *Cox v. Milner*, 23 id., 479; *Whithaus v. Shack*, 5 How. Pr., 310; 60 Ga., 391; *Anderson v. Neff*, 11 S. & R., 208. Even if it should be held that the intention of the plaintiff was to keep separate and distinct his interests as owner and as mortgagee under his own mortgage, it cannot be so held in regard to the Duffy mortgages. Those mortgages were paid by him after he had purchased and taken a conveyance of the premises. For such conveyance he agreed to pay off these mortgages, and in paying them he simply paid off his own indebtedness and had the evidences of the indebtedness discharged and satisfied. *Marvin v. Vedder*, 5 Cow., 671; *Halsey v. Reed*, 9 Paige, 446; *Marsh v. Pike*, 10 id., 595; *Blyer v. Monholland*, 2 Sandf. Ch., 478; *Ferris v. Crawford*, 2 Denio, 595; *Cornell v. Prescott*, 2 Barb., 16; *Russell v. Pistor*, 7 N. Y., 171; *Angel v. Boner*, 38 Barb., 425; *Kellogg v. Ames*, 41 id., 218; *Champney v. Coope*, 32 N. Y., 543; *Pelton v. Knapp*, 21 Wis., 63.

For the respondent there was a brief by *Sloan, Stevens & Morris*, and oral argument by *Mr. Stevens:*

1. The discharge of the Duffy mortgages was made under a

mistake of fact and in ignorance of the existence of the judgment. Equity will therefore set aside the satisfaction, and hold that the transaction amounted to an assignment of the mortgages to the plaintiff, and he will be subrogated to all the rights of the mortgagees. *Barnes v. Mott*, 64 N. Y., 397; *Lambert v. Leland*, 2 Sweeney (N. Y.), 218. This doctrine of subrogation is recognized to the fullest extent by this court, in *Levy v. Martin*, 48 Wis., 198. When the revival of a prior lien, which has been nominally cancelled, places the holder of a subsequent lien in no worse position than he would have been in if the prior incumbrance had been assigned, a court of equity will always subrogate a person so paying, to full rights under the prior incumbrance. *Warner v. Blakeman*, 36 Barb., 501; *Patterson v. Birdsall*, 6 Hun, 632; *Barr v. Patrick*, 52 Iowa, 704; *Bruse v. Nelson*, 35 id., 157; *Vannice v. Bergen*, 16 id., 595; *Dudley v. Bergen*, 23 N. J. Eq., 397; *Dubois v. Schaffer*, id., 401; *Hampton v. Nicholson*, id., 423.    2. The *Stein* judgment being rendered, docketed and assigned subsequent to the Duffy mortgages and to the plaintiff's own mortgage, the docketing of the same was not constructive notice thereof to the plaintiff. *Cheesebrough v. Millard*, 1 Johns. Ch., 409; *Truscott v. King*, 6 Barb., 346; *Stuyvesant v. Hone*, 1 Sandf. Ch., 419; *Deuster v. McCamus*, 14 Wis., 307; Wade on Notice, sec. 203.

LYON, J.    As we understand the testimony of the plaintiff, he accepted the quitclaim deed of the mortgaged premises from Osborne pursuant to an express agreement between them that the note and mortgage of February 21, 1878, for $229, was thereby satisfied and discharged. His testimony seems to admit of no other construction. By this agreement the $229 mortgage was discharged, and the satisfactions of the Duffy mortgages by *Stein*, in the proper records of the county, at the request of the plaintiff, discharged those mortgages. Hence, by the acts and procurement of the plaintiff, the four mortgages in controversy were cancelled and ceased to be liens

upon the land covered by them. Were these subsisting mortgages, we might not find it very difficult to hold, under the authorities cited, that the interest represented by the $229 mortgage was not merged in the legal title conveyed to the plaintiff by Osborne, and that the plaintiff should be subrogated to the rights of the mortgagees in the Duffy mortgages, so that all of these mortgages could be made available to protect the plaintiff against the lien of the *Stein* judgment, which is junior thereto. But before the questions of merger and subrogation can be raised at all, the mortgages now cancelled and discharged must be restored and vitalized. This can only be done by cancelling and holding for naught the satisfactions of the Duffy mortgages, which the plaintiff caused to be entered of record, and his express agreement with Osborne to accept the conveyance of the legal title in full satisfaction and discharge of the $229 mortgage.

The precise question is, therefore, whether, under the circumstances of the case, the plaintiff is entitled to be relieved of those satisfactions and of such agreement. Has he shown himself entitled to have them set aside, cancelled and held for naught? The circuit court found (no doubt correctly) that there was no fraud or collusion on the part of the defendant *Welch*, the owner of the *Stein* judgment, and granted the relief prayed on the sole ground that plaintiff acted in ignorance of the existence of that judgment, in the matter of the satisfaction and discharge of the mortgages. Undoubtedly the plaintiff knew nothing of the judgment, and, presumably (although he has not so testified), had he known of its existence, he would not have had the mortgages discharged, or made the contract he did with Osborne for the conveyance. But that alone is not sufficient to entitle him to have the discharged mortgages reinstated as valid liens upon the land. He must also have exercised reasonable diligence to ascertain whether subsequent liens had been put upon the property. A court of equity never relieves a man from the consequences of

his own culpable negligence. Discussing the rules upon which courts of equity proceed in relieving, or refusing to relieve, against contracts made or acts done through mistake or in ignorance of material facts, Judge Story says that "where an unconscionable advantage has been gained by mere mistake or misapprehension, and there was no gross negligence on the part of the plaintiff in falling into the error, or in not sooner claiming redress, and no intervening rights have accrued, and the parties may still be placed *in statu quo*, equity will interfere, in its discretion, in order to prevent intolerable injustice." 1 Eq. Jur., § 138*i*. In section 146 the learned author says: "It is not, however, sufficient in all cases to give the party relief, that the fact is material; but it must be such as he could not by reasonable diligence get knowledge of when he was put upon inquiry. For if, by such reasonable diligence, he could obtain knowledge of the fact, equity will not relieve him, since that would be to encourage culpable negligence." In a note to the section last cited is the following: "If a court of equity is asked to give relief in a case not fully remediable at law, or not remediable at all at law, then it grants it upon its own terms and according to its own doctrines. It gives relief only to the vigilant and not to the negligent; to those who have not been put upon their diligence to make inquiry, and not to those who, being put upon inquiry, have chosen to omit all inquiry, which would have enabled them at once to correct the mistake, or to obviate all ill effects therefrom. In short, it refuses all its aid to those who, by their own negligence, and by that alone, have incurred the loss, or may suffer the inconvenience."

In *Mamlock v. Fairbanks*, 46 Wis., 415, this court made an application of the rule above stated. That was an action to rescind a contract of sale of a certain note and mortgage by the defendant to the plaintiff, and to recover the money paid therefor. The ground upon which relief was claimed was, that the defendant misrepresented the identity of the debtors,

which misrepresentation affected the value of the securities. It was held that if, by the exercise of reasonable diligence, the plaintiff had the present means of ascertaining the identity of the debtors, and was not prevented from doing so by any artifice of the vendor, there could be no recovery. The opinion contains some of the authorities for the rule, not specially cited herein, and the case is a very strong one against the plaintiff. *Levy v. Martin*, 48 Wis., 198, is not in point. There the mortgage sought to be revived was discharged without the consent of the plaintiff, and against an express agreement between him and the personal representatives of the deceased mortgagor, that it should be assigned to him. Under these circumstances we found no difficulty in cancelling the satisfaction and subrogating the plaintiff to the rights of the original mortgagor. There was no question of diligence in the case.

We have examined the cases cited by the learned counsel for the plaintiff on the subject of the rescission of contracts or instruments for ignorance or mistake of material facts; but in none of them, so far as we have perceived, is the question of diligence raised or passed upon.

We are now to consider the question whether the present plaintiff used proper diligence to ascertain the condition of the title when he made his agreement with Osborne, and when he paid and procured the discharge of the Duffy mortgages.

The plaintiff is a man of some wealth, and is apparently familiar with the usual modes of transacting ordinary business. He evidently knew that a judgment against Osborne would be a lien upon the mortgaged premises, and also the effect upon the title of a discharge of the mortgages. He knew also that Osborne was utterly insolvent and thriftless. The number and amount of mortgages which the latter had put upon his land during the preceding seven years, absorbing its whole value, was sufficient notice to him of Osborne's pecuniary condition. The known insolvency of Osborne would naturally make an

ordinarily prudent man more cautious when dealing with the title to his land. Then again the mortgage of Allen represented nearly or quite one-half of the value of the land, and was paramount to all the others. *Stein* is a merchant in Madison, and plaintiff knew him well. It does not appear that he is a dealer in real estate to any considerable extent. The very fact that he had purchased the Duffy mortgages, which were junior to the Allen mortgage, would seem to suggest to a reasonable mind that he must have had some special reason for doing so, and that such reason might well be that he had become interested in some way in the land. But these circumstances, suggestive as they were, failed to open the lips of the plaintiff. He made no inquiry concerning the title, either of *Stein* or Botkin or Osborne. Had he done so, and been told that no incumbrance had been placed upon the land subsequent to his mortgage for $229, he might stand in a very different position in this action.

But this is not all. A month after he took the conveyance from Osborne, he went with *Stein* to the office of the register of deeds to have the latter discharge the two oldest Duffy mortgages, and some weeks later went again to the same office to have the other Duffy mortgage discharged. Of course, he was in close proximity to the office of the clerk of the circuit court, and could easily have gone there and ascertained whether any judgments had been entered against Osborne. It seems to us that common prudence required him to do so, or else to interrogate *Stein* or Osborne or Botkin as to the condition of the title. Yet he made the agreement and took the conveyance from Osborne, and procured *Stein* to discharge the Duffy mortgages, without doing either. He suffered the matter to rest in *statu quo* until an execution was issued on the judgment, and (so far as it appears) first asserted the rights claimed in this action, on the day the land was sold by the sheriff under the execution, which was about ten months after the last Duffy mortgage was discharged.

Our minds are impelled to the conclusion that, under these circumstances, the plaintiff was guilty of most culpable negligence in failing to inform himself of the existence of the *Stein* judgment; and hence, that he has no standing in a court of equity to obtain the relief he seeks. If there is any case in the books which grants such relief where the act sought to be relieved against was the result of negligence so gross and inexcusable, we have failed to find it. Certainly no such case is cited by counsel.

The application of this rule may work hardship in some cases; perhaps it does in this case. But the rule requires nothing unreasonable, and is a most salutary one. It is infinitely better that men should be held to the consequences of their own culpable carelessness, than that courts of equity should undertake to relieve therefrom. The rule requires reasonable caution and prudence in the transaction of business, and is deeply imbedded in our jurisprudence. It is within the principle and reason of *caveat emptor*. *Mamlock v. Fairbanks, supra.* The abrogation of the rule would tend to encourage negligence and to introduce uncertainty and confusion in all business transactions.

The judgment of the circuit court must be reversed, and the cause remanded with directions to that court to dismiss the complaint.

*By the Court.*— So ordered.